**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

IN RE:

| | |
|---|---|
| WILLIAM KENT DUNSTON & DEBORAH LILE DUNSTON, | CASE NO.: 04-40114-LMK |
| Debtors_____/ | CHAPTER 11 |
| WILLIAM WHITNEY & DEBORAH WHITNEY, | |
| Plaintiffs | |
| v. | ADV. PRO. NO.: 04-4011-LMK |
| WILLIAM KENT DUNSTON & DEBORAH LILE DUNSTON, | |
| Defendants_____/ | |

**MEMORANDUM OF OPINION**

**THIS MATTER** came on for hearing on December 14-15, 2005, upon Plaintiffs William and Deborah Whitney's Adversary Complaint against the Debtors, William and Deborah Dunston. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 151 and 157(b)(2). The Plaintiffs' Complaint initially contained seven separate counts on which they were seeking judgment. On July 6, 2005, this Court entered an order dismissing counts I, II, and VI of the complaint upon the Defendants' Motion to Dismiss, and this case proceeded to trial on Counts III, IV, V, and VII (mislabeled in the Complaint as a second Count VI). At the hearing, the Court issued its ruling and dismissed Counts III, IV, and V, which were counts seeking nondischargeability of certain debts, and took only Count VII, in which the Plaintiffs are seeking specific performance of the oral agreement for a mortgage on the Defendants' home, under advisement. This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052.

**FINDINGS OF FACT**

The Dunstons owned an operated a business incorporated in Florida as National Champion Football Academy, Inc., but which did business as International Sport ("International Sport"). This business specialized in taking American university groups, such as sports teams and bands, on tours to both foreign and domestic destinations. The Dunstons were the sole owners, shareholders, directors and officers of the corporation. The Dunstons had operated International Sport or similar businesses for over 20 years. They marketed their business to universities through the use of their website and through direct mailings, which were the main source of their non-referred business. They intended to expand their business further through referrals from previous satisfied customers.

The Dunstons' business primarily involved arranging events in which the university groups that hired them would participate, such as sports games, parades, or other musical performances. The Dunstons would also make all of the associated travel arrangements for the groups. These travel arrangements typically included air travel on commercial airlines, ground transportation, hotel lodging, meals, and even sightseeing tours. The Dunstons' travel packages also included a tour manager (an employee of International Sport) who would greet the group upon their arrival to the destination and escort them throughout the tour. The tour manager was always fluent in the language of the destination and was available to the group for the duration of its stay.

International Sport entered into contracts with the tour participants, either with the institution or with the participants individually. The Dunstons would quote an all-inclusive, per-person price for the tour, based upon their calculations of the cost of airfare, lodging, ground transportation, tour manager expense, and other associated expenses, depending upon the requirements of each client. The Dunstons then added a certain amount to cover their overhead and allow for a profit, usually between $300 and $500.00 per person. Pursuant to the contract between International Sport and its clients, the tour price was payable in full well in advance of a group's departure date. Failure to pay according to the terms and conditions of the contract would result in cancellation of that individual traveler's reservation and forfeiture of earlier deposits. Accordingly, before any group traveled, the

entire amount owed by the group to International Sport (including the overhead & profit build-in) had been paid to the company.

After International Sport received the money from its customers, they placed the money in the company's general bank account. Many times, the Dunstons would be arranging tours and receiving deposits for more than one group at a time; however, the monies received from the different tour groups were not segregated to insure that an individual group's funds would be available when it was time to pay for that group's expenses. Rather, the funds were intermingled in a single bank account to which the Dunstons had exclusive and unfettered access. In addition to covering legitimate and necessary business expenses, such as information technology support, telephone expenses, and advertising, they freely spent company money on personal expenses, such as mortgage payments, private school tuition for their children, and groceries. The Dunstons never reconciled their books in order to determine how much they owed the company. Both Mr. and Mrs. Dunston testified at trial that it was only when their accountant, William H. Gardner, C.P.A., reconciled their books that such outlays were properly classified as "loans to shareholders." Mr. Gardner was retained to file the Dunstons' personal and business taxes, but both the Dunstons' and International Sport's tax returns for the years 1999, 2000, and 2001 were filed significantly late, even considering the extensions they received in some years. The tax returns Mr. Gardner prepared for International Sport showed that the amount of loans to shareholders increased each year. The last tax return filed by International Sport was filed for the 2001 tax year, and the total amount of loans to shareholders outstanding at that time was $156,089 (increased from $119,957 at the beginning of the year), while the amount of the company's retained earnings was a negative $258,991 (a further decline from a negative $144,309 at the beginning of the year). Mrs. Dunston testified that she was unconcerned at the time about the increasing amount of the loans to shareholders and that she and her husband did not make any plans to repay these "loans."

Unsurprisingly, there came a point after which the Dunstons could no longer pay for a group's travel expenses at the time they traveled, even though the group had already paid the

Dunstons in full. Because they failed to segregate the money (which, although not required by law, would certainly have been prudent), and instead used it for their own personal benefit and to pay company overhead, they relied upon future business to pay current expenses. For example, say Group A was traveling to Greece in June. By the time they checked into their hotel, the money they paid the Dunstons back in January had already been spent, not on the tour group's lodging or airfare, but rather on the company's overhead expenses or the Dunstons' childrens' private school tuition. Group B, which was not traveling to Ireland until December, had begun sending their deposits to International Sport in June. So, the Dunstons would take Group B's money to pay for Group A's expenses, all the while hoping that they would procure Group C's business so that they could pay Group B's expenses when Group B traveled. If something happened and no Group C appeared, then the Dunstons would have been in trouble. This is what Mrs. Dunston referred to throughout both her testimony before the Court and her dealings with the Whitneys as a "cash-flow problem." Referring to it as such is disingenous, because the "problem" was directly related to the Dunstons' financial mismanagement of the company. Had they used their clients' money for its intended purposes first and spent only the build-in amount on business overhead and personal expenses, then there would have been no "cash-flow" issues.

The Dunstons moved to Tallahassee from Alabama in 1996. They entered into a lease-purchase agreement on a house on Lakeshore Drive, just down the street from William and Deborah Whitney. Mr. Whitney is an attorney in Tallahassee, and Mrs. Whitney is a registered nurse. This couples met and became acquainted with one another, and they began to socialize frequently. Mrs. Whitney and Mrs. Dunston became especially close friends. Mrs. Dunston knew that Mrs. Whitney spoke fluent Spanish, and in 1998, Mrs. Whitney began to work part-time for International Sport. This started with Mrs. Whitney occasionally serving as a tour manager on International Sport tours, particularly those to Spanish-speaking countries. After Mrs. Whitney had served as a tour manager on several successful tours, the Dunstons hired her to work nearly full-time in their office, assisting with making travel itineraries and arrangements, issuing quotes, and continuing to occasionally serve

- 4 -

as a tour manager on some trips. In order to work full-time for International Sport, Mrs. Whitney took a break from her 20-year career as a registered nurse. Mrs. Whitney had no business background and was not involved in any bookkeeping functions for the International Sport.

In December of 2000, the Dunstons told the Whitneys that their business was experiencing a "short-term cash-flow problem" and that they needed to borrow money for certain group expenses associated with the James Madison University Marching Band trip to Greece. Through Mrs. Whitney's experience at International Sport, the Whitneys knew of the $500-per-traveler build-in and were aware that because of the size of the group, the trip would yield a gross profit in excess of $250,000. The Whitneys loaned the Dunstons $45,000, and the Greece trip was a success. The Whitney family went along on the trip, and Mr. Whitney testified that he was very impressed with the way that the Dunstons appeared to successfully organize such a large and profitable group tour. The Dunstons repaid the Whitneys' loan in full in less than 60 days, which was outside the 30-day term of the note.

In early May of 2001, the Dunstons again told the Whitneys that their business was experiencing another "short-term cash-flow problem." Mr. Whitney's father had recently passed, so the Whitneys had some money from Mr. Whitney's inheritance in the bank that was immediately available. They offered, and the Dunstons accepted, another $45,000 loan, this time payable within 90 days. The Whitneys deposited the full amount directly in International Sport's checking account, and Mrs. Dunston (but not Mr. Dunston) signed a note in her individual capacity, promising to repay the money within 90 days. Later that same month, Mrs. Dunston again informed Mrs. Whitney that International Sport was continuing to experience a "short-term cash-flow problem" and asked to borrow an additional $45,000 for just 30 days this time. The Whitneys agreed to loan the Dunstons this additional money upon the Dunstons' representations that they would have no problem repaying the money and that they could be trusted with Mr. Whitney's inheritance. Mrs. Dunston signed a promissory note for this amount as well. The Dunstons never repaid a penny to the Whitneys on these loans (the "May 2001 loans").

The terrorist attacks of September 11, 2001, negatively impacted travel both in the United States and internationally. This negative impact is what ultimately led to the collapse of the Dunstons' pyramid. University groups both cancelled previously planned trips and ceased making new travel arrangements– meaning there was no longer a "Group C" lined up to pay the expenses of current travelers. On November 1, 2001, the Dunstons' business, National Champion Football Academy, Inc., d/b/a International Sport, filed for Chapter 11 bankruptcy protection in this court in order to reorganize.[1] In order to successfully reorganize, it was imperative that International Sport obtain new business and continue to build relationships with former clients in order to generate new business from referrals. Despite the generally bleak outlook for the travel industry in November 2001, the Dunstons had one fairly large trip that was going forward. International Sport had planned a trip for the James Madison University Marching Band to travel to New York City to participate in the Macy's Thanksgiving Day Parade on November 22, 2001. The Dunstons hoped to continue and strengthen their business relationship with Dr. Patrick Rooney, J.M.U.'s band director, because he was well-connected in the college band world and could potentially open up that market to International Sport. By taking large groups such as marching bands, rather than small groups such as basketball teams, International Sport would be able to survive and thrive on just a handful of trips each year, so it made sense to the Dunstons to cultivate this market.

Dr. Rooney was scheduled to arrive in New York City for the parade on the the Tuesday before Thanksgiving, November 20, 2001. That same morning, Mrs. Dunston told Mrs. Whitney that the hotels in New York City were insisting on being paid for the band's rooms 24 hours in advance of check-in or else they would not allow the band members to check into the hotel. Mrs. Dunston also said that she and her husband did not have the money to pay for the band's rooms. Both Mrs. Dunston and Mrs. Whitney testified that they were aware of the devastating effect that the hotels' refusal of rooms to J.M.U.'s band would have on the Dunstons' relationship with Dr. Rooney

---

[1] The case was subsequently converted to one under Chapter 7.

and, by extension, International Sport's future as a business. Mrs. Dunston testified that she was prepared to fly to New York City and sit down with Dr. Rooney to tell him the bad news (that his band would not be allowed to check into hotel rooms that the school thought they had already paid for). During Mrs. Whitney and Mrs. Dunston's discussion of this matter, someone proposed that the Whitneys charge the J.M.U. hotel rooms to their personal credit cards. Mrs. Whitney called Mr. Whitney to speak with him about the situation and get his advice. After speaking with her husband, Mrs. Whitney told Mrs. Dunston that the Whitneys would be willing to charge the hotel rooms on their personal credit cards only if the Dunstons agreed to give the Whitneys a third mortgage on their home to secure both the credit card charges as well as the outstanding May 2001 loans. Although the Whitneys had made the prior loans on an unsecured basis, they were unwilling to loan further monies to the Dunstons without security as International Sport was then operating under Chapter 11 and Mr. Whitney was better aware of the financial difficulties facing the Dunstons and their company. Mrs. Dunston told Mrs. Whitney that before she could agree to giving the mortgage, she would need to speak with her husband to get his approval and also to Thomas Woodward, International Sport's bankruptcy attorney, to make sure that their giving the mortgage to the Whitneys would not be violative of the bankruptcy laws.

Both Mr. and Mrs. Dunston and Mr. and Mrs. Whitney testified at trial, and this is the point at which their testimony diverged. Mrs. Whitney testified that she told Mrs. Dunston that they would absolutely not put the hotel rooms on their credit cards without a mortgage on the Dunstons' home. Mrs. Dunston, however, seems to recall only a mention of such a thing. However, Mrs. Whitney was much more believable. Her recollection of the events of November 20, 2001, while not as "clear" as Mrs. Dunstons' self-serving memories, was infinitely more plausible. Mrs. Whitney testified that she spoke with Mrs. Dunston on the phone while Mr. Dunston was driving Mrs. Dunston to the airport so that she could fly to New York City to be with the J.M.U. Marching Band. Mrs. Dunston testified that she does not recall such a conversation; nevertheless, the Court finds that such conversation did occur. In this cell phone conversation, Mrs. Dunston told Mrs. Whitney that she

had spoken with Mr. Dunston regarding the mortgage, and informed her that they had agreed to give the mortgage and take the loan. The Court also finds that Mr. Dunston agreed at this time to give the mortgage. He was in the car with Mrs. Dunston and allowed her to make that representation to the Whitneys, thus evidencing his agreement to the terms. Mr. Dunston and Mr. Whitney then worked together in a fury to get the credit card information to the hotel in time for the band to check in. The Court finds by more than just a preponderance of the evidence that both Mr. and Mrs. Dunston agreed during that phone conversation to give a mortgage to the Whitneys on their home, with the only caveat being their need to confer with Mr. Woodward to ensure the legality of such a move. Mrs. Dunston testified that she made it "crystal clear" to the Dunstons that they would not charge the rooms without the Dunstons' agreeing to give a mortgage on their home, Mrs. Dunston represented to Mrs. Whitney that she and her husband agreed to the terms, and the Dunstons took the money.

Although the Whitneys allege that the mortgage covered both the November credit card charges and the May 2001 loans, the Court can only find that the agreement was for the credit card charges. It is possible that the Whitneys intended for the agreement to encompass all outstanding balances owed to them by the Dunstons, but based on the testimony of the parties and other evidence, the Court finds that there was only a meeting of the minds as to the credit card charges of November, 2001. The Court bases this finding not only on the highly credible testimony of the Whitneys (and correspondingly incredible testimony of the Dunstons), but also on the manner in which the parties conducted themselves after such an agreement was made. From his law office, Mr. Whitney faxed the information required by the New York City hotels to the hotels to authorize the charges. Mr. Dunston helped him out from his home office, giving Mr. Whitney the contacts and numbers he needed to complete the transaction. The Whitneys, then split the hotel charges on three of their personal credit cards, for a total amount charged of $38,043.08. There was no time to memorialize the agreement that had been reached between the parties, or to draft and execute a mortgage prior to the charges being made, as the J.M.U. band members were to check into the hotels within a very

- 8 -

short period of time. The J.M.U. band's New York City trip was a success, and the Dunstons' relationship with Dr. Rooney was preserved.

Following Mrs. Dunston's return from New York after Thanksgiving, the Whitneys requested that the Dunstons sign documents evidencing the emergency agreement between the parties. Mrs. Dunston told the Whitneys that she still needed to talk to Mr. Woodward regarding the legality of such an agreement under bankruptcy law. On November 30, 2001, Mrs. Whitney and Mrs. Dunston met for lunch. During lunch, Mrs. Whitney gave Mrs. Dunston an envelope containing the mortgage Mr. Whitney had drafted pursuant to their oral agreement of November 20, 2001. The Dunstons testified that they were outraged at the terms of the mortgage. Notably, the outrage was directed not at the mortgage in general, but rather at a provision in the mortgage which identified the contents of the Dunstons' house, such as their household furnishings, as additional collateral. Mr. Dunston, who unconvincingly testified that he only remembered the mortgage coming up after the credit card charges were made, testified that when the mortgage issue did come up, he refused to do it because the Whitneys asked for the household furnishings. It does not make sense that the Dunstons would have refused to agree to give a mortgage on their home and then, when a mortgage was presented later anyway, become outraged not at the presumptuousness of the Whitneys for demanding a mortgage on their home that they had not agreed to, but at the inclusion of their household furnishings as additional collateral. This is further evidence that there was an agreement to give a mortgage between the parties, but that such agreement did not include a security interest in the Dunstons' personal property.

On December 3, 2001, Mrs. Dunston e-mailed Mr. Whitney and told him that she had not yet met with Mr. Woodward to discuss the mortgage issue. In the e-mail, Mrs. Dunston stated, "I don't know if I will be allowed to change the status [of] the debt after the filing has taken place." Again, Mrs. Dunston makes no indication that the mortgage was unexpected, or that they did not agree to it–she simply seems to be concerned about violating bankruptcy law. She also does not say that she is going to ask if giving a mortgage would be advisable; rather, her concern appears to be

whether it is legal. Mr. Woodward testified that when he met with Mrs. Dunston about the mortgage, she did not inform him of any prior agreement between the parties to give a mortgage for the debt or that the Whitneys alleged such an agreement. Mr. Woodward did not advise the Dunstons that executing such mortgage would be a violation of federal bankruptcy law, but rather told her that it was "not a good idea.". The Dunstons then refused to sign any mortgage agreement with the Whitneys. The Dunstons did repay $6,000 towards the credit card debt, but the last payment on that debt was made on March 18, 2002. The Whitneys filed claims for the balance of their loans in the corporate bankruptcy proceedings. The Whitneys then filed a civil action in Leon County Circuit Court against the Dunstons personally and obtained a default against them, but the Dunstons filed a personal bankruptcy petition under Chapter 7 (Case Number 02-70739), which was subsequently converted to Chapter 13 and then dismissed by the Court on January 20, 2004, under 11 U.S.C. § 109(e) because the amount of their debts rendered them ineligible for Chapter 13 relief. On February 2, 2004, the Dunstons filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code.

Besides flatly (and unconvincingly) denying the existence of the agreement to give a mortgage, the Dunstons' defense to this suit appears to be that the Whitneys should have known better– and they should have. Mr. Whitney is an attorney, and Mrs. Whitney worked in International Sport's offices for approximately two years before the Whitneys loaned any money to the Dunstons. This case would have been easier for the Whitneys had Mr. Whitney put the entire agreement between the parties in writing. Further, there may not even have been a need for this case had Mrs. Whitney heeded the obvious financial warning signs at International Sport. The Whitneys knew that the Dunstons received the trip money up front and for some reason still could not meet their obligations, and they were aware of the Dunstons' "cash-flow" issues when the May 2001 loans were made and that the company was in bankruptcy in November 2001. It was clearly not prudent of the Whitneys to continue to throw good money after bad in loaning these sums to the Dunstons. However, at the time, the couples were best friends, particularly the wives, and the Whitneys had no indication that the Dunstons would take advantage of their generosity so completely. The Dunstons'

demeanor on the witness stand did not endear them to the Court. They exhibited absolutely no regret for the way they treated the Whitneys and took absolutely no responsibility for the demise of the company, instead blaming the entire collapse of the business on the terrorists attacks of September 11, 2001, and the fallout from those attacks. Despite what Mrs. Dunston would have the Court believe, the Court does not accept that the Whitneys chased after the Dunstons, begging them to borrow money. When it comes down to it, however, the parties' behavior towards each other and what each of the couples either should have known or should have done is largely irrelevant, except when it comes to the Court's weighing of the witnesses' credibility. It does not matter whether the Whitneys allowed the hotel rooms to be charged to their credit cards out of the goodness of their hearts to help their friends or in a futile attempt to keep the company somewhat profitable so that they could recover the $90,000 they had previously loaned the Dunstons. All questions of fraud or intent to repay or reliance ceased to be relevant in this case when the Court dismissed the other counts of the complaint. The only issue remaining for the Court to decide is whether or not there was an oral contract for a mortgage and, if so, whether such contract is specifically enforceable.

## CONCLUSIONS OF LAW

The first question before the Court is whether or not the agreement between the Dunstons and Whitneys constitutes an enforceable contract under Florida law. If the Court finds that there is an enforceable contract between the parties with respect to the mortgage, then the Court must determine whether specific performance of such agreement is an available remedy. For the reasons set forth herein, the Court concludes that the agreement between the parties was an enforceable contract under Florida law and that specific performance is available to effectuate that agreement.

Under Florida law, an oral contract is subject to the same basic legal requirements as written contracts, such as offer and acceptance, consideration, and definite terms. *St. Joe Corp v. McIver*, 875 So.2d 375, 381 (Fla. 2004). An oral contract that requires one party to give a mortgage on his or her homestead is enforceable, even thought it is not in writing, because oral agreements to give mortgages are not barred by Florida's Statute of Frauds. *Martyn v. First Federal Savings & Loan*

*Ass'n of West Palm Beach*, 257 So. 2d 576 (Fla.App. 4 Dist. 1971). Further, a party who is seeking to enforce an oral contract must prove its existence by only a preponderance of the evidence. *St. Joe Corp.*, 875 So.2d at 381. However, where specific performance of an oral contract is sought, the existence of the agreement must be established by "competent and satisfactory proof which much be clear, definite, and certain." *Miller v. Murray*, 68 So.2d 594, 596 (Fla. 1953).

In order to create a contract, "it is essential that there should be a reciprocal assent to a certain and definite proposition." *Holloway v. Gutman*, 707 So.2d 356, 357(Fla.App. 5 Dist. 1998). Here, the Whitneys made the original offer to the Dunstons. They offered to loan the Dunstons the money they required for the hotel rooms in New York (via charging them on their credit cards), if the Dunstons would promise to give them a mortgage on their home to secure both the credit card debt and the $90,000 antecedent debt. The Court finds that the Dunstons agreed to give the mortgage on their home to secure only the credit card charges, subject to Mr. Woodward's assessment of its legality under bankruptcy law. The Whitneys accepted this counteroffer and evidenced that acceptance by charging the hotel rooms to their credit cards. There was a clear meeting of the minds as to the terms of the agreement. The Whitneys loaned the Dunstons the money, and the Dunstons promised to give a mortgage securing the debt to the Dunstons. The terms of such mortgage will be deemed to be those that were specified in Article VI of the Dunstons' confirmed Chapter 11 Plan.

The Dunstons argue that even if there is a contract, it is unenforceable because of the condition in the contract allowing the Dunstons to check with Mr. Woodward to make sure giving the mortgage was allowed under bankruptcy law. However, it is well-settled that valid contracts may contain conditions precedent to liability under the contract or even to the existence of the contract itself. *Meekins-Bamman Prestress, Inc. v. Better Const., Inc.*, 408 So.2d 1071 (Fla.App. 3 Dist. 1982); *Barco v. Penn Mut. Life Ins. Co. Of Philadelphia*, 36 F.Supp 932 (S.D. Fla. 1941) *aff'd* 126 F.2d 56 (5th Cir. 1942). The condition precedent in this case was a condition precedent to the Dunston's liability under the contract. If Mr. Woodward had advised the Dunstons that they were not permitted under federal bankruptcy law to give a mortgage to the Whitneys, then the Dunstons

would not have been obligated to do so. Accordingly, per the contract between the parties, the Dunstons were to give a mortage on their home to the Whitneys to secure the debt owed on the November 20, 2001, credit card charges if such a mortgage was permissible. The Whitneys had already loaned the money, and the Dunstons would still have been liable for the debt on an unsecured basis had Mr. Woodward informed them that the mortgage was impermissible. Mr. Woodward (correctly) advised the Dunstons in December, 2001, that there was no provision under federal bankruptcy law prohibiting them from executing such a mortgage, but that it would not be advisable to do so for an antecedent debt. The condition precedent to liability was confirmation from Mr.Woodward that the mortgage was allowed, not that it was advisable. Thus, the condition precedent was met, and the Dunstons' obligation to give the mortgage attached at that time. The Whitneys fully performed their part of the bargain, but the Dunstons have refused to perform their obligations under the contract, and thus are in breach of the contract.

Since the Court has concluded that there was an enforceable contract to give a mortgage between the parties, and that such contract has been breached by the Dunstons, the Court must now determine whether or not it is specifically enforceable against them. The purpose of the remedy of specific performance is to give the one who seeks it the benefit of his contract by compelling the other party to perform under the contract. It is the means through which a court can compel a party to do what he or she ought to have done in the first place without the court's intervention. *In re Chick Smith Ford, Inc.*, 46 B.R. 515 (Bankr. M.D. Fla. 1985). Specific performance is an equitable remedy that is not obtainable as a matter of right by either party to a contract, and it will not be granted if there is an adequate remedy at law. *Rybovich Boat Works, Inc. v. Atkins*, 585 So.2d 270 (Fla. 1991). The granting of the equitable remedy of specific performance of a contract rests solely in the sound discretion of the court to which the application for such relief is made. *Id.* A court's discretion is exercised upon a consideration of all of the circumstances of the case with a view to serving the ends of justice, and a court is thus obligated to consider based on the facts of the case if the exercise of the remedy would achieve an unfair or unjust result. *Id.*

An agreement to execute a mortgage on realty may be specifically enforced in equity if the plaintiff has performed his obligations under the agreement by furnishing the money for the which the parties have agreed to give the mortgage in question. However, since a mortgage is a means of securing a debt, if the plaintiff in such a case can collect his money in an action at law, then that remedy may be considered to be complete so as to bar a suit for specific performance. *Blake v. Blake*, 128 S.E. 139 (W.Va. 1925). Accordingly, the remedy of specific performance does not follow as a matter of course, unlike in breaches of contracts involving the sale of real estate, and to obtain such relief, a plaintiff must prove facts which call for equitable relief in the case, for instance, that the defendant is insolvent. *Brown v. E. Van Winkle Gin & Machine Works*, 39 So. 243 (Ala. 1904); *Steward v. Bounds*, 9 P.2d 1112 (Wash. 1932) *mod'd on other grounds*, 15 P.2d 1119 (1932). The insolvency of a defendant operates to destroy the adequacy and efficacy of the legal remedy ordinarily sought by plaintiffs in these cases, and thus allows a court to consider granting an equitable remedy such as specific performance. *La Mar v. Lechlider*, 185 So. 833 (Fla. 1939).

Mr. Dunston's consent and agreement to the contract is essential to the question of whether the contract to give a mortgage on the Dunstons' homestead is specifically enforceable. A mortgage involves two separate concepts. It is both an executory contract in which the mortgagor promises to permit a future sale of property if the underlying debt is not paid, and it is also a specific lien against the property described in the mortgage. *Pitts v. Pastore*, 561 So.2d 297, 301 (Fla. 1990). It is well-settled that one can agree to create a lien on after-acquired property, in which case, such lien simply fails to attach until such property is actually acquired by the mortgagor. *Id*. A mortgage given by only one spouse on a married couple's jointly owned homestead operates in the same manner. While one spouse can, theoretically, mortgage the homestead unilaterally, such mortgage is "ineffectual as a lien until such time as either the spouse joins in the alienation or the property loses its homestead status." *Id*. Accordingly, had Mr. Dunston not joined in the making of the contract for the mortgage to Whitneys, such agreement would be a binding contract, and it still might be specifically enforceable against Mrs. Dunston in that she might be required to execute a mortgage

- 14 -

in favor of the Whitneys, but such mortgage would not be able to be foreclosed up on until the property lost its homestead status.  However, as the Court finds that Mr. Dunston did join in the agreement to give the mortgage, it concludes that Mr. Dunston is a party to the contract to give a mortgage. Therefore, there are no homestead issues that would operate as a bar to the enforceability of the mortgage as a lien on the Dunstons property.

The Whtineys fully performed as required under the contract, and the Dunstons continue to refuse to perform, putting them in breach of the contract.  The Dunstons are insolvent, as evidenced by this bankruptcy proceeding and the fact that the Dunstons' personal liability on the debt is  dischargeable in this case,  so there is clearly no adequate remedy for the Whitneys at law. Further, the equities of this case weigh heavily in favor of granting the remedy.  Justice may only be served in this case by requiring the Dunstons to perform under their agreement with the Whitneys. There is no other remedy available for the Whitneys and no other possibility for them to receive what they ought under their contract.   With foresight they previously lacked, they did not put their trust in the personal responsibility of the Dunstons, and denying them relief would deprive them of the security they relied upon in entering into the agreement with the Dunstons.  It would be inequitable for this Court to allow the Dunstons to refuse to perform under the contract and leave the Whitneys completely empty-handed.  Accordingly, specific performance is an available and appropriate remedy in this case and the Dunstons will be required to execute a third mortgage on their property in favor of the Whitneys.

## CONCLUSION

The Dunstons and Whitneys entered into an enforceable contract under which the Dunstons are required to execute a third mortgage on their home in favor of the Whitneys.  The condition precedent to the Dunstons' liability on the contract was met when the Dunstons were informed that giving such a mortgage would not be violative of federal bankruptcy laws, and their liability to give the mortgage attached at such point. The Whitneys have fully performed under the agreement, and the Dunstons remain in breach. The Dunstons are insolvent, as evidenced by this bankruptcy filing,

and thus there is no adequate remedy at law for the Whitneys.  Specific performance is available as a remedy to the Whitneys, and it is equitable and just that it be granted.  Accordingly, the Dunstons will be required to execute a mortgage on their homestead in favor of the Whitneys in the amount of the unpaid credit card charges, $32,043.08, according to the terms outlined in Article VI of the Dunstons' confirmed Chapter 11 Plan.   Counts III, IV, and V of the Complaint shall be dismissed as announced by the Court at the conclusion of the hearing on this matter.  A separate final judgment will be entered in accordance herewith.

DONE AND ORDERED in Tallahassee, Florida, this  22nd  day of March, 2006.

                                              Lewis M. Killian Jr.
                                              United States Bankruptcy Judge

cc:     William Whitney
        Deborah Whitney
        William Kent Dunston
        Deborah Lile Dunston
        Allen Turnage
        Charles Edwards